IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 14, 2018

**STATE OF TENNESSEE v. RANDY TIMOTHY JONES**

**Appeal from the Circuit Court for Lawrence County**
**No. 34098      Robert L. Jones, Judge**

_____

**No. M2017-00769-CCA-R3-CD**

_____

A Lawrence County jury convicted the Defendant, Randy Timothy Jones, of DUI per se, reckless driving, violation of the seatbelt law, violation of the due care law, and failure to maintain his lane, and the trial court sentenced him to eleven months and twenty-nine days of probation after he served forty-eight hours in jail.  On appeal, the Defendant contends that the trial court erred when it did not exclude the blood alcohol report because the State did not adequately establish the proper chain of custody.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J. and ROBERT L. HOLLOWAY, JR., J. joined.

James M. Marshall, Spring Hill, Tennessee, for the appellant, Randy Timothy Jones.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Vey, Assistant Attorney General; Brent A. Cooper, District Attorney General; Adam Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a traffic accident occurring on March 21, 2016, wherein the Defendant's truck ran off the side of the road and crashed, landing upside down.  For this accident, the Lawrence County grand jury indicted the Defendant for DUI, first offense, DUI per se, first offense, and several other driving-related offenses.  The parties presented the following evidence at the Defendant's trial:  Michael Kilpatrick, a trooper with the Tennessee Highway Patrol ("THP"), testified that on March 21, 2016, he came upon a truck that had just crashed in a field located in Lawrence County.  He saw the

driver, who he later identified as the Defendant, climbing out of the vehicle. From his vantage point approximately 100 feet from the truck, he saw that no one else was in the truck.

Trooper Kilpatrick said that he called to the Defendant and asked if the Defendant was okay. The Defendant indicated that he was okay and he walked toward the trooper. Trooper Kilpatrick noted that he did not see any visible injuries on the Defendant. The trooper commented to the Defendant that he was glad that the Defendant was wearing a seatbelt, and the Defendant agreed. The trooper again asked the Defendant if he was okay, and the Defendant said that he was shaken up but okay. The trooper asked if he needed an ambulance, and the Defendant said he did not.

Trooper Kilpatrick testified that he noticed that the Defendant's speech was slurred, that he had bloodshot eyes, and that the odor of alcohol was "coming off of his breath." On these bases, the trooper asked the Defendant if he had consumed any alcohol, and the Defendant responded that he had had a couple of beers but did not offer a time frame. Trooper Kilpatrick said that he stayed with the truck until the tow truck arrived.

Trooper Kilpatrick testified that his car did not have audio and video equipment, so he called another trooper, Jonathan Pulley, to come to the scene. The trooper explained that he believed that they needed to have the Defendant perform field sobriety tasks to determine whether he displayed signs of intoxication, and Trooper Kilpatrick wanted the tasks to be recorded.

Trooper Kilpatrick described the conditions as "clear" that day. He said that the Defendant performed his tasks on level pavement. Trooper Kilpatrick said that he watched Trooper Pulley perform the field sobriety tasks and, after he did so, Trooper Pulley transported the Defendant to the hospital to have his blood drawn.

During cross-examination, Trooper Kilpatrick testified that he investigated how the crash occurred, and he said that the Defendant appeared to have over-corrected, causing the vehicle to go into a ditch and subsequently a field. Trooper Kilpatrick said that the vehicle overturned at least twice, and possibly four times. He said that the truck was "totaled." The trooper said that he did not recall seeing blood on the Defendant's shirt and pants and that he did not call for medical attention because the Defendant said he was okay.

Jonathan Pulley, a trooper with the THP, testified that he responded to this accident scene at around 3:00 p.m. When he arrived, the Defendant was located by his vehicle, which was being loaded by the wrecker. Trooper Pulley described the Defendant

2

as "cooperative" and said that he had some blood on his clothing from the accident.

Trooper Pulley testified that he smelled "a strong odor of alcoholic beverage coming from" the Defendant and that the Defendant had slurred speech and stumbled. He asked the Defendant if he had consumed any alcoholic beverages, and the Defendant said that he had had "a couple of beers" at around 11:30 a.m. that day. Trooper Pulley testified that he asked the Defendant to perform some field sobriety tasks, including the Horizontal Gaze Nystagmus ("HGN"), the nine-step walk and turn task, the one-legged stand task, the finger-to-nose task, and the counting backwards task.

Trooper Pulley described the walk and turn task, saying that the roadway was level and without lines. He told the Defendant to walk nine steps, heel-to-toe, in a straight line out and then back. He describe the Defendant as performing "poorly," saying that he stopped walking on the first nine steps at the turn, missed heel-to-toe on several occasions in both directions, raised his arms, and made an improper turn. Further, he took ten steps in both directions rather than nine steps.

Trooper Pulley said the Defendant also performed poorly on the one-legged stand. The Defendant continued to put his foot back down on the ground before counting to ten. The Defendant had one arm behind his back and one arm to his side, in contravention of the trooper's instruction to keep both arms by his side at all times.

The trooper testified that the finger-to-nose test required that the task taker lean his head back and closes his eyes. The taker was instructed not to anticipate the trooper's instructions but, when the trooper said "left" use their left index finger to touch their finger to the tip of their nose and when the trooper said "right" to touch their right index finger to the tip of their nose. Trooper Pulley testified that he gave the Defendant these instructions, and the Defendant acknowledged that he understood the instructions. The trooper said that, during the test, the Defendant missed his nose on the first "left." The Defendant also missed the switch of hands and used the wrong finger to touch his nose.

Trooper Pulley said that he then asked the Defendant to count backwards from 57 to 43. He ensured the Defendant understood the instructions. The Defendant then counted backwards from 57 and stopped at 47 instead of 43 and missed one number during the countdown. The trooper asked him about this mistake, and the Defendant seemed confused.

The trooper testified that, at the conclusion of the tasks, he placed the Defendant under arrest for DUI. He took the Defendant to Southern Regional Hospital to have his blood drawn and tested for the concentration of alcohol. The trooper said that he asked the Defendant to submit to a blood draw, and the Defendant consented.

3

Trooper Pulley testified that the lab drew blood while he watched, and then he took with him the TBI test kit. He took the Defendant to the Lawrence County Jail for booking and then went to his office to log into evidence the blood test kit. Trooper Pulley filled out an online form, which he printed and signed, and a property release form. He placed both items inside the box and placed an evidence tracker on the box. He then dropped the evidence in the locked drop box at the THP department and did not have any further contact with the evidence box.

The State then offered, and the trial court admitted, a video recording from Trooper Pulley's vehicle. In the video, the Defendant said that he had consumed two beers and was on his way home from Nashville. The trooper asked the Defendant to watch his finger while leaning his head back, and the Defendant swayed while looking at the trooper's finger. The trooper told him to keep his head still and only move his eyes, and the Defendant repeatedly swayed while completing this task. Trooper Pulley demonstrated the walk and turn task to the Defendant. The Defendant repeatedly stepped out, lost his balance, and did not walk heel-to-toe as demonstrated. The trooper demonstrated the one-legged stand for the Defendant and asked him to perform that task. The Defendant did not place his hands where instructed, repeatedly lost his balance, and did not maintain counting as instructed. At one point when he stumbled, he said that he had to go to the bathroom. At a second time when he stumbled, he told the trooper to "work with him" because he was "tired." The Defendant never successfully completed this task. The trooper then demonstrated the finger to nose task. The Defendant successfully followed the trooper's instructions in several successions. Trooper Pulley asked the Defendant to count backward from 57 to 43. The Defendant said the wrong number on one occasion and stopped counting at 47. At the conclusion of the field sobriety tasks, the trooper informed the Defendant that he was under arrest for DUI.

During cross-examination, Trooper Pulley agreed that the Defendant had some blood on his clothing from the accident. The trooper agreed that people suffering from a concussion may have symptoms resembling symptoms of intoxication, such as dizziness, balance problems, and difficulty remembering and focusing. Trooper Pulley agreed that the Defendant said during the video that he had to use the restroom. He agreed that it could be harder to focus when one has to defecate. Trooper Pulley defended his decision to give the Defendant field sobriety tasks, noting that the Defendant smelled of alcohol and admitted to having consumed alcohol.

Trooper Pulley testified that he put the box containing the Defendant's blood sample in the evidence drop box. From there, the box was handled by the evidence custodian, Trooper Jackie Vandergriff.

4

John W. Harrison, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigations ("TBI"), testified that he had with him the electronic chain of custody document created by the TBI computer system. He said that the Defendant's blood sample came to the TBI and was received by evidence technician Rudy McGowan. The TBI document indicated that the evidence came by certified mail and was sealed at the time it was received. Ms. McGowan ensured that the tamper-proof seal was intact, broke the seal, and removed the contents of the box. She documented that the box contained two vials of blood, which she assigned a unique laboratory number. She then took the request for blood processing form and put it into the computer system, made a description of the evidence, ensured that the information on the tubes matched each other and the box. She then contacted the division where the blood would be tested and informed them that the blood was ready to be analyzed.

Special Agent Harrison testified that the TBI document indicated that Ms. McGowan received the evidence on March 30, 2016, and that on April 12, 2016, she transferred the evidence to Special Agent Harrison's division. Ms. McGowan kept the evidence in a refrigerator in a locked vault before transfer. Ms. McGowan gave the evidence to Matt Buck, a toxicologist in Special Agent Harrison's division, who locked it in his refrigerator. Special Agent Harrison testified that the remaining blood sample was still locked in the refrigerator in his division and was scheduled to be destroyed on June 1, 2017.

Special Agent Harrison testified that, when he received the sample, he checked everything that Ms. McGowan had done, all the information on the blood tube, and compared everything to the form number. He said that all of the information aligned and that the blood sample was in good condition, so he analyzed the blood. Special Agent Harrison said that, in accordance with procedures, they analyzed the blood twice on two different days.

The Defendant objected and called for a jury-out hearing. He asserted that the State had failed to establish a proper chain of custody. After hearing the parties on the issue, the trial court ruled that there was adequate proof to establish the chain of custody. The jury reentered, and Special Agent Harrison testified that the Defendant's blood alcohol level was .154 gram percent.

Based upon this evidence, the jury convicted the Defendant of DUI per se, first offense, and several related traffic offenses. The trial court sentenced him to forty-eight hours of confinement followed by eleven months and twenty-nine days of probation. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant contends that the trial court erred when it admitted the results from the blood draw because the State had not established the chain of custody. He asserts that the State did not establish the custody of the evidence between the time when Trooper Pulley placed the blood sample test kit into the evidence drop box and when Special Agent Harrison received that evidence nine days later. He notes that Agent Harrison was not the person at the TBI who initially received the blood sample, and he asserts that the nine-day gap is too wide and too long to consider the chain of custody established. The State counters that the evidence proved that the test kit box was sealed when Trooper Pulley placed it in the evidence drop box and that it was sealed when it was received by the TBI. The State asserts that, therefore, the State presented sufficient evidence of the chain of custody.

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *State v. Cannon*, 254 S.W.3d 287, 294 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000) and *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). Under this standard, we will not reverse unless the trial court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Id.* (citations omitted).

Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." It is "'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *Scott*, 33 S.W.3d at 760 (quoting *State v. Holbrooks*, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)). This evidentiary rule is designed to insure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

Professor Neil Cohen and his colleagues have aptly summarized the rule:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. In theory at least, testimony from each link is needed

6

to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Neil P. Cohen et al., *Tennessee Law of Evidence* § 9.01[13][c] (5th ed. 2005) (footnotes omitted).

Each link in the chain of custody "should be sufficiently established," but the rule "does not require that the identity of tangible evidence be proven beyond all possible doubt; nor should the State be required to establish facts which exclude every possibility of tampering." *Cannon*, 254 S.W.3d at 296 (citing *Scott*, 33 S.W.3d at 760). To that end, the State is not required "to call all of the witnesses who handled the item." *Id.* Rather, "when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* On the other hand, if the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen et. al., Tennessee Law of Evidence § 901.12, at 624 (3d ed.1995)).

The facts of this case are similar to three prior decisions of this court. In *State v. Earnest Laning*, a panel of this court held that there was "a sufficient chain of custody to reasonably assure the blood sample's identity and integrity" when the officer received the sample from a phlebotomist; the officer then placed the sample in a "locked evidence refrigerator" where it could only be removed by the evidence custodian but did not know if the sample was mailed or hand-delivered to the TBI; the testing TBI agent testified that the sample was retrieved from the TBI's drop box; the TBI agent explained that the sample was received by an evidence technician who opened the package and "would have noted in the case file if someone had tampered with the box;" and the TBI agent testified that the blood tube was still vacuum-sealed when she opened it. No. E2011-01882-CCA-R3-CD, 2012 WL 3158782, at *3 (Tenn. Crim. App., at Knoxville, Aug. 6, 2012), *no Tenn. R. App. P. 11 application filed*.

Likewise, in *State v. Michael Joseph Arbuckle*, a panel of this court held that "the State established the identity and integrity of the evidence through a sufficient chain of custody" when the officer received a blood sample from the "hospital attendant" who drew the defendant's blood, the officer testified that he then placed the sample in an "evidence locker to be mailed to the [TBI] crime laboratory," and the testing TBI agent "testified regarding the procedure for receiving and documenting blood samples and that

7

any irregularities in the shipping or receiving of the sample would have been noted" in the TBI file. No. M2000-02885-CCA-R3-CD, 2001 WL 1545494, at *3 (Tenn. Crim. App., at Nashville, Dec. 5, 2001), *perm. app. denied* (Tenn. May 28, 2002).

In *State v. Pascasio Martinez*, this court recently held that results of blood testing were admissible when the State had presented evidence through the officer that he received the defendant's blood sample from the phlebotomist and transported them to the police station where he put them in the confiscation box to be transported to the TBI. No. E2016-01401-CCA-R3-CD, 2017 WL 5613976 (Tenn. Crim. App., at Knoxville, Nov. 21, 2017), *no Tenn. R. App. P. 11 application filed*. The officer testified that he locked the box, and dropped the key inside the box. A TBI employee testified that the TBI file noted that the defendant's blood samples had been delivered to the TBI drop box. *Id.* at *3. She explained, as she did in this case, that an evidence technician would have removed the samples from the drop box, opened them, and noted in the TBI file any evidence of tampering. *Id.* There were no such notation in the TBI file, and Ms. Aksanov testified that the defendant's blood samples appeared "well preserved" and were "not clotted" when she removed them. *Id.* This court concluded that the State established a sufficient chain of custody. *Id.*

In the case presently before us, Trooper Pulley testified that he watched the Defendant's blood be drawn by the hospital lab technician, who then placed the tubes in a box. Trooper Pulley ensured the Defendant's identifying information was properly listed on the box, ensured the box was sealed, and placed the box in the locked evidence drop box. Special Agent Harrison testified that Ms. McGowan received the box from THP. He said that she ensured that the box was sealed and not tampered with. She took the evidence out of the box, logged the information, and stored the blood in a locked refrigerator until it was transferred to Special Agent Harrison's division for testing. Special Agent Harrison said that, when he received the evidence, he again checked all of Ms. McGowan's work, noted that there were not irregularities and that the blood appeared in good condition so he tested the blood. We conclude that the State established a sufficient chain of custody and that therefore the trial court did not abuse its discretion in admitting the test results into evidence. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

8