# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 11, 2001 Session

## STATE OF TENNESSEE v. DONAVAN EDWARD DANIEL

### Direct Appeal from the Circuit Court for Weakley County
### No. CR121-1999    William B. Acree, Judge

_____

### No. W2000-00981-CCA-R3-CD - Filed December 28, 2001

_____

After a jury trial, the defendant, a juvenile at the time of the offenses, was convicted of six counts arising out of the shooting deaths of two victims. The jury sentenced him to life in prison for Count One, first degree premeditated murder of the first victim, and for Count Two, first degree felony murder of the first victim based upon robbery of the first victim.  The jury sentenced him to life in prison without the possibility of parole for Count Three, first degree felony murder of the second victim based upon premeditated murder of the first victim, and for Count Four, first degree felony murder of the second victim based upon robbery of the first victim.  The trial court merged the conviction for Count Two into Count One, and the conviction for Count Four into Count Three.  The trial court sentenced the defendant to twenty (20) years for Count Five, especially aggravated robbery, one (1) year for Count Six, possession of marijuana with intent to resell, and ordered the sentences to be served concurrently.  On appeal, the defendant challenges the trial court's denial of his motion to suppress and his request for a state-funded mitigation expert, as well as the sufficiency of the evidence to support his convictions for first-degree murder.  After careful review of the record, we hold that the trial court did not err in failing to suppress the defendant's statements.  Further, we hold that although the defendant's status as a non-capital defendant did not preclude him from receiving state-funded expert services, our de novo review of the record reveals that the defendant failed to make the required showing of a particularized need for a mitigation expert.  Therefore, the trial court's denial of the defendant's request for such services was correct.  Finally, we hold the evidence is sufficient to sustain the defendant's convictions for premeditated and felony murder in the first degree. Accordingly, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOE G. RILEY and ROBERT W. WEDEMEYER, joined.

C. Michael Robbins (on appeal), Memphis, Tennessee; Joseph P. Atnip, District Public Defender; and Colin Johnson, Assistant Public Defender (at trial and on appeal), for the appellant, Donavan Edward Daniel.

Paul G. Summers, Attorney General & Reporter; Kim R. Helper, Assistant Attorney General; Thomas A. Thomas, District Attorney General; James T. Cannon and Allen J. Strawbridge, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Donovan Daniel, a seventeen (17) year old, was transferred from juvenile court to circuit court and indicted by a Weakley County Grand Jury on the following six counts: Count One, first degree premeditated murder of Clarence Jones; Count Two, first degree felony murder of Clarence Jones in perpetration of and while intending to commit robbery; Count Three, first degree felony murder of Cassandra Tamakia Thomas in perpetration of and while intending to commit first degree murder; Count Four, first degree felony murder of Cassandra Tamakia Thomas in perpetration of and while intending to commit robbery; Count Five, especially aggravated robbery of Clarence Jones; and Count Six, possession of a controlled substance with intent to sell or deliver.

The defendant filed a pretrial motion to suppress his statements to police, which was denied by the trial court. The state gave notice of its intent to seek a sentence of life without the possibility of parole. The defendant filed an ex parte motion requesting the court to provide a mitigation expert for the defense, which the trial court denied. The defendant was tried by a jury and found guilty of all six counts.

The jury sentenced the defendant to life in prison for Counts One and Two; and life in prison without the possibility of parole for Counts Three and Four. The trial court merged the conviction for Count Two, felony murder of Clarence Jones, into the conviction for Count One, premeditated murder of Clarence Jones. The trial court also merged the conviction for Count Four, felony murder of Tamakia Thomas based on the underlying felony of robbery, into the conviction for Count Three, felony murder of Tamakia Thomas based on the underlying felony of premeditated murder. The trial court sentenced the defendant to twenty (20) years for the especially aggravated robbery conviction, Count Five, and to one (1) year for the possession of marijuana with intent to resell conviction, Count Six. The trial court ordered the sentences to be served concurrently.

The trial court denied the defendant's timely filed motion for a new trial. A timely notice of appeal was filed with this court. In this appeal, the defendant raises the following three issues: (1) whether the trial court erred in denying the defendant's motion to suppress three incriminating statements made by the defendant; (2) whether the trial court erred in denying the defendant's request for a mitigation expert; and (3) whether the evidence is sufficient to sustain the convictions for premeditated and felony murder in the first degree.

**FACTS**

The defendant gave several statements to the police, which established the following sequence of events as told by the defendant. On the afternoon of June 2, 1999, the defendant and two other young men visited the victim, Clarence Jones' home in Martin, Tennessee. The defendant and his friends smoked marijuana with Jones. After the defendant's two friends left, Jones and the defendant smoked more marijuana and the defendant drank a mixed drink. During this time, a man came to the home and bought marijuana from Jones. After he left, the defendant drank another mixed drink. Misty Schrems and a couple of her friends also came over to buy marijuana from Jones. Ms. Schrems and the other guests remained at the victim's home with the defendant and Jones for a few hours. They all smoked more marijuana. Several more people came to the house and bought marijuana from Jones. After everyone but the defendant and Jones had left, Shannon Parham and Natasa James came to the house. By this time, the defendant was "starting to feel crazy" and tried to "get with" one of the girls. The two girls left after twenty or thirty minutes.

The defendant and Jones continued to smoke marijuana and drink alcoholic beverages until Jones' roommate, Tamakia Thomas, came home. Shortly after Thomas arrived home, Jones rolled

another marijuana cigarette and went to his room to "play some music." The defendant went to the kitchen and picked up Jones' rifle from the counter. The defendant walked into the hallway leading to Jones' bedroom. The defendant shot and killed Jones, who was standing in his bedroom. The defendant did not think that Jones saw him with the gun prior to being shot. Neither the defendant nor Jones said anything before the defendant shot Jones. The other victim, Tamakia Thomas, was in the bathroom with the door shut when the defendant shot Jones. The defendant turned around after shooting Jones and was startled to find that Thomas had opened the bathroom door and was standing just inside the bathroom. The defendant shot and killed Thomas.

After killing Jones and Thomas, the defendant walked around for a moment and tried to gather his thoughts. He started looking for some money to "get out of town." The defendant took money from Jones' pocket and Jones' dresser. He also took a ring off of Jones' finger and the watch from his wrist. At this point, someone began knocking on the front door. The defendant put a sock on his hand and tried to escape out of the window in Jones' room. The knocking stopped before the defendant was able to get out the window, so he went out the front door instead. Before leaving in Jones' car, the defendant grabbed the murder weapon and a large bag of marijuana. The defendant drove to Union City, where he "stashed" the murder weapon in a dumpster. He also left Jones' car in the parking lot of the Wal-Mart in Union City. A friend of the defendant, Mitchell Avent, then drove the defendant to a motel, also in Union City. Mr. Avent went inside and paid for the room with money the defendant had taken from Jones. The defendant spent the night at the motel and called Mr. Avent to pick him up around noon the next day. Mr. Avent drove the defendant to his home in Martin, and the defendant "went on about [his] day like nothing had happened."

Mitchell Avent testified for the state at the defendant's trial. Mr. Avent was charged as an accessory to the murders. As part of a plea agreement, he pled guilty and received two years of probation in exchange for his testimony. Mr. Avent testified that the defendant came to Mr. Avent's girlfriend's house around eleven o'clock p.m. on the night of the murders. At that time, Mr. Avent was living in his girlfriend's house, which was located in Union City. The defendant told Mr. Avent that he had killed Jones and Thomas and asked if Mr. Avent knew of anywhere that the defendant could stay. Mr. Avent told the defendant that he could not stay there and that he did not know anyone else that he could stay with. The defendant asked Mr. Avent to help him dispose of Jones' car. Mr. Avent agreed to follow the defendant to a location where the defendant could leave the car. They stopped at a dumpster on the way so that the defendant could throw away the murder weapon. Mr. Avent testified that he told the defendant that he should get rid of the weapon. Mr. Avent said that his girlfriend was afraid of the defendant and that he did this at her request. The defendant left Jones' car in the Wal-Mart parking lot in Union City.

After leaving the Jones' car at Wal-Mart, Mr. Avent took the defendant to a motel in Union City. He got a room for the defendant with money that the defendant gave him. The next day, Mr. Avent returned to the motel to pick up the defendant. At this time, the defendant gave Mr. Avent a Rolex watch belonging to Jones, which Mr. Avent later gave to the police. Mr. Avent took the defendant back to the defendant's home in Martin. The defendant, however, returned to Mr. Avent's house later that evening and asked Mr. Avent to provide an alibi for him during the time that the murders were committed. Mr. Avent refused and asked the defendant not to mention his name to the police.

From his conversations with the defendant, Mr. Avent got the impression that the defendant's motive for killing Jones and Thomas was Jones' money. Mr. Avent clarified that the defendant never specifically told Mr. Avent why he had murdered Jones and Thomas, but did tell Mr. Avent that he knew that Jones had some money before he killed him. Mr. Avent also testified that the defendant appeared to have been smoking marijuana on the night of the murders because his eyes were red. Mr. Avent did not, however, indicate that the defendant was otherwise impaired. He

stated that the defendant appeared to know what he was doing.

Natasa James also testified for the State. Ms. James visited the home of Jones and Thomas on the night of the murders to get money that Jones owed her for a washer and dryer that she had recently sold to Jones. Her roommate, Shannon Parham, was with her, and they arrived at the home between eight and eighty-thirty p.m. The defendant and Jones were alone in the home. When Ms. James walked in the door, the defendant was standing and holding a rifle, which was pointed in her direction. Jones told the defendant to put the gun down. The defendant lowered the gun but continued to hold the gun while the two women were there. The group sat in the living room and at some point the defendant asked Ms. James if he could touch her leg. Shortly thereafter, the two women left.

Ms. Parham also testified at the defendant's trial. Ms. Parham corroborated that the defendant had a rifle in his possession the entire time she and Ms. James were there. Ms. Parham did not notice any unusual behavior by the defendant. Based on her observation, the defendant and Jones were not in any type of disagreement.

Misty Schrems testified that she also visited the victims' home the night of the murders. Ms. Schrems, along with two friends, arrived at about five or five-thirty p.m. and stayed until about eight or eight-thirty p.m. The defendant and Jones were the only people there during that time. Ms. Schrems said that everyone was drinking beer and smoking marijuana while she was there. Jones had a large shopping bag in the kitchen, which was full of marijuana. She said that it was in plain view for the defendant to see many times while she was there.

Ms. Schrems returned to the victims' home around eleven-thirty p.m. the same night. Jones' car was not in the driveway, and no one answered the door. Ms. Schrems returned home but continued to telephone the victims' home throughout the next day. Unable to reach the victims by telephone, Ms. Schrems returned to the victims' home around six-thirty p.m. Finding the door unlocked, she went inside to leave a note. The stereo was on and very loud. Ms. Schrems tried to turn down the stereo in the living room but realized that it was not on. She went to the bedroom to turn off the other stereo. That was when she saw that the room had been torn apart and found Jones' body lying on the floor. Ms. Schrems became very upset and ran outside the home screaming that Jones was dead. While inside the house, Ms. Schrems noticed that there was some marijuana on top of the dryer. Afraid that Ms. Thomas would get in trouble if the police found it, she re-entered the home and took the marijuana to the bathroom, intending to flush it down the toilet. When she walked into the bathroom, however, she discovered Ms. Thomas' body lying in the bathtub. Ms. Schrems left the marijuana in the doorway of the bathroom and ran back out of the home screaming that both Jones and Thomas were dead. She screamed for the neighbors to call the police but jumped in the car and left before the police arrived. Ms. Schrems said that she panicked and drove to the home of Thomas' family to tell them that she was dead. Ms. Schrems then accompanied Thomas' family members back to the victims' home and talked with the police.

Chad Johnson, a forensic scientist for the Tennessee Bureau of Investigation, examined the evidence at the scene of the murders and the evidence collected from the defendant's residence. Mr. Johnson testified that the body of Clarence Jones was found in the bedroom and that the body of Tamakia Thomas was found in the bathtub. Photographs of the locations of the bodies were introduced as evidence. Also introduced as evidence were Jones' ring, a large bag of marijuana, and a shirt with blood on it, all found in a dumpster near the defendant's home. Mr. Johnson also testified that he found money in the sole of one of the defendant's tennis shoes.

A forensic pathologist, Dr. Gunther, performed autopsy examinations of both victims. Dr. Gunther testified that both victims died from a single gunshot wound to the head. Mr. Jones was

shot in the back left side of his head above the ear. Ms. Thomas was shot in the forehead from an estimated distance of anywhere between a half a foot and two feet. Dr. Gunther testified that the gunshots to both victims likely caused immediate death.

Law enforcement officers Rick Kelly, David Moore, and Joe Walker also testified about the events that led to the defendant's arrest. This testimony is addressed, infra, in our analysis of the admissibility of the defendant's confessions.

## ANALYSIS

The defendant challenges (1) the admissibility of several statements made by the defendant to police officers during custodial interrogations, (2) the trial court's refusal to appoint a mitigation expert for the defense, and (3) the sufficiency of the evidence to support his convictions for premeditated and felony murder.

### I. Admissibility of Statements

The defendant filed a pretrial motion to suppress his confessions to police on the grounds that the statements were not voluntary. After an evidentiary hearing, the trial court found that the defendant's statements were voluntary and denied the defendant's motion to suppress. The defendant now challenges the trial court's ruling and the admissibility of the statements. Precisely, he argues (1) the initial detention of him by police officers was without probable cause and illegal, and, therefore, all subsequent statements made by the defendant must be suppressed; (2) that the statements were obtained without a knowing and voluntary Miranda waiver; and (3) the statements were coerced through physical deprivation of sleep and food and illusory promises of leniency and, therefore, were not voluntary. The illusory promises to which the defendant refers are alleged statements by one of the investigating officers to the defendant urging him to cooperate with police in order to avoid the death penalty. The defendant was seventeen (17) years old, a juvenile, at the time the offenses were committed and thus, could not receive the death penalty for the crimes. Tenn. Code Ann. § 37-1-134 (a)(1).

We begin by addressing the state's argument that the defendant waived the issues of whether there was an inadequate Miranda waiver and an unlawful detention because he failed to allege either of these grounds at the trial level. The defendant's pretrial motion to suppress alleged that the statements were not voluntary but did not raise the issue of whether the statements were inadmissible as fruit of an unlawful detention. In this court, the defendant for the first time contends that his detention was unlawful and that the statements made as a result of such unlawful detention should have been excluded from evidence as fruit of the poisonous tree. The defendant does not address the state's assertion that he waived all arguments not raised at the trial level, nor does he give a reason for his delay in raising the arguments.

We agree that the issue of whether the defendant's statements are inadmissible because he was unlawfully detained was waived when he failed to raise that issue at the trial level. It has long been established that an appellate court will not consider an issue raised for the first time in the appellate court. Lawrence v. Stanford, 655 S.W.2d 927, 929 (Tenn. 1983). Nor may a defendant litigate an issue in the trial court on one ground, abandon the ground, and assert a new basis or ground for his contention in this court. State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990), perm. to appeal denied, (Tenn. 1990); State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988); State v. Brock, 678 S.W.2d 486, 489-490 (Tenn. Crim. App. 1984). Although this court may, in certain circumstances, address as plain error an issue that would otherwise be waived, we conclude that the application of the plain error doctrine is not appropriate in the instant case. Tenn. R. App. P. 13(b); State v. Adkisson, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994).

Accordingly, we find the issue of whether the defendant's statements should have been suppressed because they were a product of the defendant's unlawful detention by police officers to be procedurally defaulted. However, the adequacy of the defendant's Miranda waiver was addressed at the pre-trial suppression hearing and, therefore, was not waived.

<u>Evidence Presented at Pretrial Suppression Hearing</u>

In the present case, three police officers, the defendant, and the defendant's mother testified at the pre-trial suppression hearing. Based upon the testimony, the following facts were not disputed. The defendant's mother brought him to the police station for questioning between eight and ten o'clock p.m. the day after the murders were committed. The defendant was not a suspect at this time. However, the police had received information indicating that the defendant was the last person to see the victims alive. The defendant did not make any incriminating statements during the first interview with police and returned home with his mother. After verifying that the defendant had lied about what time he arrived home the night of the murders, the police asked the defendant's mother to bring him back to the station. The defendant and his mother returned to the station. At around midnight, the defendant gave another written statement, which was not incriminating. The interviewing officer did not Mirandize the defendant prior to him making the statement. Around one o'clock a.m., the defendant was Mirandized and questioned again by two other officers. This questioning lasted until about two-thirty a.m., when the defendant's mother asked if they could go home and get some rest. The officers indicated that the defendant was free to go but requested that they be allowed to search his residence. The defendant's mother gave her permission for the search, and the officers followed her and the defendant home.

At the defendant's residence, the officers did not permit the defendant to enter his home because of the possibility that he might contaminate the scene. At least one officer remained outside with the defendant at all times. He was not permitted to lie down in his mother's car to rest because the officers were afraid that he might try to leave. Therefore, the defendant alternately sat and laid down on the sidewalk and the hood of his mother's car. At some point before dawn, the officers decided to call the crime scene van to conduct a more thorough search for evidence. While they waited for the van to arrive, one of the officers searched a nearby dumpster and found a bag of marijuana and some clothing inside. The officer immediately confronted the defendant with what he had found. At first, the defendant denied any knowledge about the items that were found but later admitted, after talking with his mother, that he had placed the marijuana in the dumpster. The defendant said that the victim, Clarence Jones, had "fronted him" the marijuana but continued to deny involvement in the murders.

While they waited for the crime scene van to arrive, the defendant and an officer, Captain Moore, discussed the seriousness of the crimes and the possible punishments. Captain Moore advised the defendant that it would be in his best interest to cooperate with the investigating officers. After the crime scene van arrived, the defendant's arms were tested for gun residue and his shoes were taken to test what appeared to be blood splatter on them. Once the officers were apprized of the blood splatter evidence and identified a ring, found in the bag of marijuana, belonging to the victim, the defendant was handcuffed and told that he was being placed under arrest for possession of marijuana. At this point, the defendant confessed to the murders. The defendant's mother was notified that the defendant was being taken into custody, and a juvenile officer was called to the scene. At around eight o'clock a.m., the defendant was transported to the police station. Once there, the defendant was given Miranda warnings again and signed a written waiver before giving a written confession.

The defendant's allegations concerning the promises of leniency were disputed at the suppression hearing. Captain Moore was asked if he told the defendant that he would get the death

penalty if he did not cooperate with police. Captain Moore responded that he did not recall ever mentioning the death penalty to the defendant. He admitted, however, to advising the defendant that "this was a crime that could land him in jail for a lot of years" and that it would be to his benefit to cooperate with the police. Captain Moore further admitted that during the discussion with the defendant concerning possible punishments, he was not aware that the death penalty was not available as a punishment for juvenile defendants. Captain Moore said that the juvenile officer advised him of such after his conversation with the defendant but continued to maintain that the death penalty was never discussed with the defendant.

The defendant and his mother both testified and related their version of how the events transpired. The defendant said he had slept until noon the day he was questioned but alleged that he was still very tired during the late-night/early-morning questioning. He also testified that Captain Moore told him if he cooperated by confessing to the crimes, he might not get the death penalty. The defendant said that this conversation occurred in his mother's bedroom after Captain Moore accompanied him to the bathroom, and that no one else was present at the time. The defendant further alleged that after Captain Moore placed handcuffs on him and placed him in the back of a police car, he told the defendant that it was his last chance to talk. He said that Captain Moore then asked if he wanted to take "a little walk to talk." The defendant testified that he believed the Captain to be saying that it was his last chance to avoid the death penalty. The defendant claimed that he confessed to the murders because of his physical exhaustion and fear of the death penalty.

The defendant's mother verified that the defendant was questioned off and on from sometime around nine o'clock p.m. until the next morning when he was arrested and taken into police custody. She testified that the defendant was very tired and that she requested several times that he be allowed to sleep on the couch. She said that the officers would not let the defendant lie down in her car even though she had the keys and there were two cars parked behind it. She did not hear Captain Moore mention the death penalty.

Analysis of Suppression Evidence

When addressing the defendant's arguments regarding the admissibility of his statements, this court looks to the facts adduced at the suppression hearing, which are most favorable to the State as the prevailing party. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. Daniel, 12 S.W.3d at 423. Indeed, these findings will be upheld unless the evidence preponderates otherwise. Id. Furthermore, this court may consider the entire record, including the evidence submitted both at the suppression hearing and at trial, in evaluating the correctness of the trial court's ruling. State v. Henning, 975 S.W.2d 290, 297 (Tenn.1998).

After hearing all of the evidence, the trial court in the instant case made the following findings:

> There is no Miranda issue involved in this case.
>
> . . . .
>
> . . . [T]he defendant, although a high school dropout, is alert and intelligent. He has a high IQ of 133, and he is also street smart. There is nothing in the record to suggest that he was too immature to understand the statements he was making and the consequences of those statements.

. . . [T]here is nothing in the record to suggest that the late hour of the statements or the fact that he had not eaten for some period of time was of any consequence.

Likewise, the fact that he was under interrogation for a considerable period of time is inconsequential. The statements were not continuous, but a series of conversations with lengthy breaks in between and the defendant's mother was with him.

The claims of a promise of leniency is factually disputed. The court accepts the testimony of Captain Moore, that he did not tell the defendant he could avoid the electric chair by cooperating with the police. . . .

. . . It was only when evidence began to mount against the defendant that he confessed to these crimes. The motion is overruled.

Based upon our review of the record, we conclude that the evidence does not preponderate against the trial court's finding that "there is no Miranda issue in this case." There was sufficient evidence to establish that the officers complied with the Miranda requirements and that the defendant knowingly waived his Miranda rights. According to Captain Moore, the defendant was read his rights before Captain Moore questioned him at the police station. The defendant confessed a few hours later, after he was placed under arrest for possession of marijuana. The defendant was read his rights again and signed a written waiver of his Miranda rights before giving a written confession at the police station. The trial judge examined the written Miranda waiver and questioned Captain Moore about it when it was introduced as an exhibit at the suppression hearing.

The evidence was also sufficient to support the trial court's determination that the confessions were voluntary. It was undisputed that the defendant was tired and had been up all night when he gave the incriminating statements. However, the trial court found that the presence of the defendant's mother, the lengthy breaks between questioning, the defendant's high IQ, and the fact that the defendant had slept until noon the day he was questioned were sufficient to establish that the statements were voluntary. Additionally, the trial court specifically accredited the testimony of Captain Moore regarding the alleged promises of leniency involving the death penalty and found that no such comment was made.

We conclude that the evidence in the record does not preponderate against the findings of the trial court. We also note that a reading of the trial record reveals that it was the defendant who introduced into evidence the two written confessions during the cross examination of Detective Walker, despite his strenuous arguments against their admission at the pretrial suppression hearing. We conclude that the trial court did not err in denying the defendant's motion to suppress his statements to police. This issue is without merit.

## II. Denial of Mitigation Services

The defendant filed an ex parte motion requesting the appointment, at state expense, of a mitigation expert. At the ex parte hearing on the defendant's motion, defense counsel stated that because the state was seeking life without parole, the jury would impose the sentence and that the jury would consider aggravating and mitigating factors. He then requested that the court grant the funds for a mitigation specialist in this non-capital case. The only authority upon which the defendant based his request was the general proposition that state funds are available in non-capital

cases "for such things as psychiatric evaluations." Both in his motion to the trial court and at the ex parte hearing, the defendant requested the state funds "in order to fully investigate and document and present" the mitigation evidence. At the time of the ex parte hearing, defense counsel had not received the affidavit from the mitigation expert, Dr. Frank Einstein. The trial court found that there was no authority to grant the motion in a non-capital case and denied the defendant's motion. An order denying defendant's request was entered on January 13, 2000.

We conclude that the trial court's finding that there was no authority to grant the defendant's motion for expert services in a non-capital case was incorrect. Based upon our review of the record, however, we conclude that the trial court did not err in denying the defendant's request for a state-funded mitigation expert because the defendant did not demonstrate a particularized need for the expert services.

In Ake v. Oklahoma, the United States Supreme Court established an indigent defendant's right to certain expert services when it held that the denial of a state-funded psychiatrist to an indigent defendant violates due process "when [a defendant's] sanity at the time of the offense is seriously in question." 470 U.S. 68, 70 (1985). The Court reasoned that fundamental fairness would not be met if "as a result of his poverty, a defendant is denied the opportunity to participate meaningfully" in his trial. Ake, 470 U.S. at 76. Because Ake was a capital case, the question remained whether due process would require the appointment of an expert in a non-capital case. The Tennessee Supreme Court answered this question in the affirmative.

In Tennessee, expert services are available to indigent defendants in both capital and non-capital cases. Tenn. Sup. Ct. R. 13 §5 (a); State v. Barnett, 909 S.W.2d 423 (Tenn. 1995). In 1995, the Tennessee Supreme Court held that the "due process principle of fundamental fairness applies to all criminal prosecutions, and does not rest upon the severity of the sanction sought or imposed." Barnett, 909 S.W.2d at 428. The court concluded that the principles of Ake, at least with respect to the assistance of psychiatric experts, are not limited to capital cases. Id. at 431. Additionally, Tennessee Supreme Court Rule 13 provides that state-funded expert assistance is available "in the trial and direct appeals of all criminal cases in which the defendant is entitled to appointed counsel . . . , [when such services] are necessary to ensure that the constitutional rights of the defendant are properly protected." (emphasis added). The purpose of the rule is to ensure that no defendant is denied the protection of his or her constitutional rights solely because of indigency. State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000). "As such, the language of Rule 13 serves to emphasize that the need for expert assistance is not limited to capital cases and that the expert assistance sought by a defendant need not be limited to a particular field of expertise, so long as the assistance is necessary to protect the defendant's constitutional rights." Id.

Having concluded that expert services are available to indigent defendants in non-capital cases, we must now determine whether the instant defendant was entitled to a state-funded mitigation expert. The decision of whether to authorize expert services lies within the discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. Barnett, 909 S.W.2d at 431. The trial court in the instant case, however, applied the wrong legal standard for evaluating such requests. Therefore, this court must review the record, applying the proper legal standard, to determine whether the defendant's motion was properly denied.

The court in Barnett held that "the defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance" before a trial court is required grant a defendant's request for expert services. Barnett, 909 S.W.2d at 430. A two prong test was created to determine whether a defendant has made the required threshold showing of "particularized need." Id. The defendant must first show that he or she "will be deprived of a fair trial without the expert

assistance." Id. Second, the defendant must show that "there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation of [the] case." Id. A trial court may properly deny a motion requesting expert services, however, if the defendant merely offers unsupported assertions that the services are needed to counter the State's proof. Id.; State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994). Furthermore, "whether or not a defendant has made the threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made." Barnett, 909 S.W.2d at 431.

Applying the guidance from above to the facts of the instant case, we conclude that the defendant failed to satisfy the "particularized need requirement." In a recent Tennessee Supreme Court decision, the court concluded that the defendant was improperly denied a DNA expert at the trial level. Scott, 33 S.W.3d at 753. In Scott, the court held that the defendant was entitled to the expert services because the defendant's counsel "listed in meticulous detail the reasons needed for the expert assistance;" such as, "to establish familiarity with proper DNA protocols and to point to relevant issues and lines of cross-examination." Id. Indeed, defendant's counsel offered testimony of other witnesses who stated that expert assistance was "crucial" to competent representation and that the subject matter was "inordinately complex and beyond the common understanding of most attorneys." Further, another expert witness stated that it was doubtful that the defendant's attorney would even know the relevant issues involved with DNA evidence without some sort of expert assistance. Id. at 754. Defendant also established that the DNA evidence was inconsistent and that expert assistance was necessary to determine whether the samples were contaminated and why the defendant was excluded as a donor in one of the tests. Id. We conclude there is no such factual detail in the record before us.

Based upon our review of the defendant's motion and the ex parte hearing transcript, we conclude that the defendant failed to specify by factual proof that the services of a mitigation expert were necessary. The defendant only asserted that the state funds were needed "in order to fully investigate and document and present" the mitigation evidence. Though the affidavit of Dr. Einstein, filed September 6, 2000, listed in small detail some factors concerning defendant's childhood, there was no clear assertion made in the motion or at the hearing concerning how such information would be used. Unlike Scott, there is little indication as to what an examination by a mitigation expert might reveal. There is little indication as to how the sought after testimony would differ from other testimony already provided at trial. The defendant did not demonstrate how the expert might establish familiarity with proper psychiatric, psychological, or other mitigation protocols, nor did he demonstrate how the expert might point to relevant issues and lines of cross-examination. Lastly, we note that the defendant did not show how the subject matter was so "inordinately complex and beyond the common understanding of most attorneys" as to warrant the need for expert assistance.

While it may not be necessary to exhibit a need based on all of the aforementioned criteria, a defendant must provide the court with more than a rough framework as to how the services would be useful. Indeed, most experts would be helpful in investigating, documenting, and presenting evidence. However, the standard by which we measure a defendant's request is based on his or her particularized need. In the instant case, defendant has failed to demonstrate such need. Accordingly, we affirm the judgment of the lower court denying the defendant's request for a state-funded mitigation expert.

### III. Sufficiency of Evidence

Before undertaking our review, we note that the jury found the defendant guilty of four counts of first-degree murder, two of which were for the murder of Clarence Jones, and two were

for the murder of Tamakia Thomas. The defendant was found guilty of both premeditated murder and felony murder of Clarence Jones. Additionally, the defendant was found guilty of two alternate counts of felony murder of Tamakia Thomas. The trial court merged the conviction for Count Two, felony murder of Clarence Jones, into the conviction for Count One, premeditated murder of Clarence Jones. The trial court also merged the conviction for Count Four, felony murder of Tamakia Thomas based on the underlying felony of robbery, into the conviction for Count Three, felony murder of Tamakia Thomas based on the underlying felony of premeditated murder. Accordingly, proof of either felony murder or premeditated murder is sufficient to sustain the conviction for the murder of Clarence Jones, and proof of either theory of felony murder is sufficient to sustain the conviction for the murder of Tamakia Thomas.

### Sufficiency of Evidence of Premeditation

The defendant's convictions for Count One, premeditated murder of Clarence Jones, and Count Three, felony murder of Tamakia Thomas based on the underlying felony of premeditated murder, both depend upon a finding of premeditation. Once a homicide is established, it is presumed to be second-degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The state then has the burden of proving that the homicide was premeditated and intentional to elevate the offense to first-degree murder. Id. "Premeditation" is described as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To find a defendant guilty of premeditated murder, the jury must determine that "the intent to kill was formed prior to the act itself" and that "the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a).

The defendant alleges that the evidence is insufficient to support a finding of premeditation in the murder of Clarence Jones. Particularly, he asserts that the state's evidence "is entirely to the effect" that the defendant "lost it" when he shot the victims. He further asserts that the defendant was at all relevant times "quite seriously intoxicated." Therefore, he concludes that the evidence was sufficient only to sustain a conviction of second-degree murder. We disagree.

When an accused challenges the sufficiency of the convicting evidence, the standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); Tenn. R. App. P. 13(e); State v. Burns, 979 S.W.2d 276, 286-87 (Tenn. 1998). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this court does not reweigh or reevaluate the evidence. Id. A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt. Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences therefrom, and the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). The jury may infer premeditation from the manner and circumstances of the killing.

State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Tennessee courts have delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, Bland, 958 S.W.2d at 660, destruction or secretion of evidence of the murder, State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), calmness immediately after the killing, Bland, 958 S.W.2d at 660, and the lack of provocation on the part of the victim, State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Considering the proof in this record in the light most favorable to the state, as we are required to do, we conclude that the evidence is legally sufficient to support the jury's finding of premeditation in the murder of Clarence Jones. The record reflects that the defendant was at the home shared by Clarence Jones and Tamakia Thomas, the victims, for several hours before the murders were committed. Several people were in and out of the victims' apartment during the time that the defendant was there. Some of the visitors smoked marijuana with Jones and the defendant during which time the defendant had many opportunities to observe Jones' large shopping bag full of marijuana. Two of the visitors also observed the defendant playing with and holding Clarence Jones' rifle a few hours before the murders.

By the defendant's own account, the murders were committed without provocation against two unarmed victims. After all of the other guests left the apartment, Tamakia Thomas returned home from work. She was in the bathroom, and Clarence Jones was standing unarmed in his bedroom with his back to the defendant when the defendant walked to the kitchen, picked up the rifle, walked to Clarence Jones' bedroom, and shot him in the head. After shooting and killing Clarence Jones, the defendant also shot Tamakia Thomas in the head as soon as she opened the bathroom door.

The defendant displayed calmness after the murders and disposed of the evidence connecting him to the murders. Immediately after the murders, the defendant took the ring from Clarence Jones' finger, the money from his pocket, and the bag of marijuana in the kitchen. He fled in the victim's car taking the murder weapon with him. He drove to a friend's house and asked the friend to help him get rid of the victim's car. The friend complied and followed the defendant to a shopping center parking lot where the defendant left the victim's car. On the way to dump the car, the defendant stopped and disposed of the murder weapon. The defendant's friend took him to a motel where he paid for a room with the money from Clarence Jones' pocket and spent the night. The defendant slept until noon the next day and then returned home where he "went on about [his] day like nothing had happened." He asked Mitchell Avent to provide an alibi for him to police. Sometime before the police searched the defendant's home, he also disposed of his bloody clothes, the bag of marijuana, and Clarence Jones' ring by throwing them in a dumpster near his home. He kept the money that he stole from Clarence Jones but hid it in the sole of his shoe.

Turning to the defendant's argument that the defendant's intoxication at the time of the murders "strongly militates" against a finding of premeditation, we note that the defendant has failed to cite any authority in support of his position. He failed to produce any evidence at trial to establish that his intoxication affected his ability to form premeditation. "Whether a defendant is too far intoxicated to premeditate . . . prior to a killing is a question for the jury to determine." State v. Durham, No. 03C01-9802-CR-000631999, 1999 Tenn. Crim. App. LEXIS 750, at *11 (Tenn. Crim. App. at Knoxville, July 26, 1999) (quoting State v. Arnold, No. 81, 1988 Tenn. Crim. App. LEXIS 557, at *3 (Tenn. Crim. App. at Knoxville, August 25, 1988)), perm. to appeal denied, (Tenn. 2000).

The jury could have reasonably found that the defendant was able to form premeditation despite his use of drugs and alcohol prior to committing the murders. The evidence adduced at trial concerning the defendant's intoxication revealed that he was coherent enough to drive the victim's

car to Mitchell Avent's house immediately after the murders. Mr. Avent also testified that the defendant appeared to know what he was doing. Finally, testimony by other guests at the victims' home on the night of the murders indicated that the defendant appeared coherent prior to the murders.

As previously explained, whether a killing is premeditated is a question of fact for the jury to decide. The jury was in a position to evaluate the testimony of the state's witnesses and the statements made by the defendant to police. The jury could infer from the circumstances of the murder of Clarence Jones that it was premeditated. Accordingly, there is sufficient evidence to support the felony murder conviction for the murder of Tamakia Thomas based on the underlying felony of premeditated murder of Clarence Jones.

Felony Murder Based on Underlying Robbery

Having found that sufficient evidence exists to support the defendant's conviction for first degree premeditated murder, we need not address whether there is sufficient evidence to support the defendant's convictions for first degree felony murder based on the underlying felony of robbery of Clarence Jones. In a case involving a killing where the jury has found the defendant guilty under both theories of first-degree premeditated murder and felony murder, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the two verdicts. See Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997); State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). In the present case, the trial court entered one judgment of conviction as to each victim. The conviction for felony murder committed during the perpetration of a robbery was merged into the conviction for premeditated murder as to victim Jones. The conviction for felony murder committed during the perpetration of a robbery was merged into the conviction for felony murder committed during the perpetration of premeditated murder as to victim Thomas. Additionally, we acknowledge that a general verdict of guilty is sustainable if any one count in the indictment is sustained by the proof. Tenn. Code Ann. § 40-18-111. Accordingly, proof of premeditated murder of Clarence Jones is sufficient to sustain the convictions.

## Conclusion

We hold that the trial court's findings concerning the voluntariness of the defendant's statements to police were supported by the record and, therefore, those statements were correctly admitted into evidence. Although we hold that non-capital defendants are not precluded from receiving state-funded expert assistance at trial, our de novo review of the record reveals that this defendant failed to show a particularized need for a mitigation expert. Accordingly, the defendant's motion was properly denied. Finally, we hold that there was sufficient evidence to support the jury's finding of premeditation in the murder of Clarence Jones. The convictions for premeditated first-degree murder of Clarence Jones and first-degree felony murder of Tamakia Thomas based upon the premeditated murder of Clarence Jones are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE