# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 4, 2011 Session

## DEBORAH LYNN DAVIS v. JACK E. SCARIANO, JR., M.D. ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 3-450-08      Wheeler A. Rosenbalm, Judge**

---

### No. E2010-00303-COA-R3-CV-FILED-JUNE 28, 2011

---

The plaintiff, Deborah Lynn Davis, appeals from a grant of summary judgment to the defendants, Dr. Jack E. Scariano, Jr., and his group, West Knoxville Neurological Associates. Except when the context requires otherwise, we will refer to the defendants collectively as "Dr. Scariano." Davis sued Dr. Scariano alleging medical malpractice and fraud related to the doctor's treatment of her and to the billing of her account. Dr. Scariano moved for summary judgment. After granting Davis several continuances, the trial court heard the motion and granted it based on Dr. Scariano's filings and the plaintiff's failure to present evidence establishing a disputed issue of material fact. Davis appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Deborah Lynn Davis, Knoxville, Tennessee, appellant, pro se.

Stephen C. Daves, Knoxville, Tennessee, for the appellees, Dr. Jack E. Scariano, Jr., and West Knoxville Neurological Associates.

## OPINION

I.

Dr. Scariano has been a board-certified neurologist since 1979. He practices in a group called West Knoxville Neurological Associates. In his career, he has performed over 30,000 electromyographies, a nerve conduction study commonly referred to as an "EMG." Davis, a long-time patient of the doctor, first saw him in 1998 for various neurological complaints including bilateral hand pain and low back pain. During the next nine years, she underwent several EMGs by Dr. Scariano in response to her reports of ongoing pain and numbness in her arms and legs. When suit was filed, Davis was 49. She is disabled and relies on social security disability benefits for her livelihood.

On October 15, 2007, Davis went to Dr. Scariano's office, according to her, "to obtain her medical records for insurance purposes." After what appears to have been an unpleasant verbal exchange, Davis was discharged from Dr. Scariano's care that same day. Nearly a year later, Davis filed suit largely based on her October 15 visit; she contends that on that date, Dr. Scariano purposefully altered the results of her most recent EMG studies to reflect – contrary to the actual test results – that everything was "normal" with her arm.

Davis, proceeding pro se, filed her "complaint of medical malpractice and fraud" on September 30, 2008. In it, she alleged that Dr. Scariano (1) fraudulently altered her medical records, thereby causing a delay in her treatment that left her with permanent injury to her hand, and (2) fraudulently charged Medicare and TennCare for services never rendered. More specifically, her complaint states:

> On October 15[,] 2007[,] [Davis] did go to [Dr. Scariano's] office to obtain her medical records for insurance purposes. Specifically[,] [Davis] was needing nerve conduction test results from tests performed at [Dr. Scariano's] practice on August 22, 2007 and September 5[,] 2007.
>
> When [Davis] received her records the nerve conduction tests she was seeking were incomplete and did not have any findings or diagnosis on them.
>
> After [Davis] plead [sic] with the staff to remedy this she was allowed to talk to [Dr. Scariano] briefly.
>
> When [Davis] attempted to talk to [Dr. Scariano] he verbally attacked her.

When [Davis] was given the nerve conduction test results back after [Dr. Scariano] had reviewed them some of the readings had been altered and a diagnosis of normal with no slowing down of the ulnar nor median nerve.

At the time [Dr. Scariano] verbally attacked [Davis] and altered her records he was aware that such actions could cause delays in [Davis] receiving treatment for the nerve blockage in her right elbow which was causing [Davis] to loose [sic] use and sensation in her right hand.

Davis claimed in her complaint that "[d]uring the time period between [Dr. Scariano's] alterations of [her] records and when she was finally able to obtain treatment for her condition[,] [her] right hand and forearm degenerated and she has lost most of the strength in her hand." She also asserted that after Medicare had reversed charges by Dr. Scariano for services not rendered, Dr. Scariano began billing her to collect the monies he returned to Medicare. Davis sought compensatory and punitive damages for the alleged "malicious, reckless, and unmindful" actions of Dr. Scariano.

In his answer, Dr. Scariano acknowledged Davis's October 15 visit to his office, but denied the substance of her allegations. He stated that Davis arrived upset, without an appointment, and was "seeking a letter from [him] stating it was medically necessary for her to leave the State of Tennessee to have an operation on her elbow." According to Dr. Scariano's affidavit, he had earlier made an appointment for Davis to see Dr. Cliff Cannon, a surgeon in Georgia of whom she was aware. Davis wanted Dr. Scariano to advise TennCare that she needed to see Dr. Cannon and "TennCare should drive her there." Dr. Scariano denied that Davis presented an actionable claim and denied liability for any injury alleged by Davis. With respect to the allegation that he purposely "altered" Davis's records, Dr. Scariano responded:

Dr. Scariano recorded the correct interpretation of the nerve conduction test results in his own handwriting based on the actual latencies that were recorded by him off of [the] video screen due to the fact that the computer marking system was not operating properly at the nerve conduction study on September 5, 2007. The allegations that the readings had been altered are denied.

On February 27, 2009, Dr. Scariano filed a motion for summary judgment supported by his own affidavit. Therein, he stated that he was aware of the recognized standard of

acceptable medical practice in the Knoxville area, that his care and treatment of Davis complied with such standard, and that there was no act or omission on his part that caused Davis's alleged injury. Dr. Scariano again expressly averred that "[t]here was no alteration of the medical records." Davis promptly moved to continue the proceedings based on her contention that Dr. Scariano had not provided her with "any and all records pertaining to her care and account" that were necessary to oppose summary judgment.

The parties initially appeared for a hearing on Dr. Scariano's motion for summary judgment on April 24, 2009, at which time Davis renewed her motion to continue. She acknowledged that Dr. Scariano had provided some of her records, but maintained they were still incomplete. In particular, Davis asserted that without certain computer "wave forms" depicting the results of all her EMG studies, an expert would not be able to determine whether the "alterations" of her test results "were to correct it or were fraudulent." Davis contended that these wave forms had not been furnished by Dr. Scariano even though they were a "standard part of the neurological report"; however, she acknowledged that, going back as far as 2006, Dr. Scariano had not included in her record wave forms for nerve conduction studies, although he had included them in years prior to 2006.

At this juncture, prompted by the court's questions, Davis more fully explained the theory of her case, as follows:

> Davis: The root of this case is actually to do with fraud, not the medical malpractice. The medical malpractice has arisen as a result of the fraud. [. . . . ]
>
> The Court:   How did he commit fraud that caused any injury to you?
>
> Davis: He altered the nerve conduction test results from September 5, 2007 to indicate that there was no neurological problem with my right arm, no blockage.
>
> The Court: Why in the word would he do that?
>
> \*   \*   \*
>
> Davis: I have yet to figure that out, to tell you the truth. I have no idea. [. . . .].

-4-

The Court: He says in his sworn affidavit that there's no alteration.

* * *

The Court: And you haven't furnished any countervailing proof.

Davis: [I]f you pull up that exhibit, you will see where he marked it out with a pen, and he states that he made the alterations as a correction of what was showing on the screen of his computer as opposed to what was printed out. [. . . .].

The reason I note that this is incorrect is he made these alterations on October 15th of 2007, after TennCare had thrown a fit about the doctor that he had referred me to for surgery being . . . out of state.

* * *

He's also refused to provide my billing records. I've already found . . . three instances of billings to Medicare for nerve conduction tests and neurological exams that never happened during the year of 2007.

The Court: Did you report that, and to whom?

Davis: I have reported it to Medicare.

Later in the hearing, the discussion concerning the nature of her case continued:

The Court: . . . I have a serious question about whether or not, . . . I can order [Dr. Scariano] to file an affidavit saying this is all the records. But if [defense counsel] is willing to have [Dr. Scariano] prepare and sign such an affidavit, certainly he may do so.

Davis: Well, I'd like that because of the simple fact that . . . it will show whether or not he is actually concealing. Because if I'm then able to produce what he's not included, then it's proof

that he's committed fraud. And that's what this case is all about
is he has committed fraud.

The Court: Well, are you telling the Court now that this case is
not about medical malpractice . . . . It's about the fact that Dr.
Scariano billed the government for treatments that he didn't
provide to you? Is that –
. . . what this is about?

Davis: It is about that, and he also . . . fraudulently altered tests
on my nerve conduction. That is also fraud. The alteration of
medical records is fraud.

The Court: So the question in this case . . . is not whether he
failed to treat you properly and you suffered an injury as a result
of that which you otherwise would not have suffered? The
question is whether or not he altered your medical records and
whether he billed the government for treatment and care that he
did not furnish?

Davis: Yes. This case is more fraud than anything.

Davis reiterated the basis of her claims, *i.e.*, after Dr. Scariano wrongly diagnosed her
arm as "normal" based on the allegedly altered test results, TennCare refused to transport her
to Georgia to see Dr. Cannon for possible surgery. She stated that, days after leaving Dr.
Scariano's care, she underwent nerve tests with another doctor that showed "axon loss," and
that she provided those results to an orthopedist, and eventually had surgery on her arm in
December 2007. She alleged that in the interim she suffered permanent nerve damage. The
trial court emphasized that in his affidavit, Dr. Scariano had denied altering her records and
she had provided no countervailing proof. The court continued the hearing to July 2009 and
advised Davis to seek the assistance of counsel.

In response to the discussion of Davis's specific claims at the April hearing, Dr.
Scariano filed a supplemental affidavit in which he averred, in relevant part, as follows:

In the summer and fall of 2007, Ms. Davis underwent two
[EMGs]. The data on the first component was placed in her
chart without clinical interpretation since she did not complete
both components of the tests which were needed for an accurate
EMG diagnosis.

-6-

At Ms. Davis's request, an appointment was made with a surgeon, Dr. Cannon[,] in Georgia, on September 26, 2007, at 2:30 pm. Her medical records were forwarded to Dr. Cannon including the data of the first component without the handwritten interpretation.

It is the prerogative of the surgeon to review the clinical findings and diagnostic tests to determine if surgery would be beneficial. If he is not satisfied with the diagnostic tests, as a supplement to his clinical findings, to make a surgical decision, he had the option to repeat the tests with a different doctor or other tests as a supplement for his clinical opinion. [. . . .]

On October 15, 2007, Ms. Davis came into my office without an appointment and had extremely disruptive behavior. She demanded an impression from the first component for the EMG's. I reviewed the first component which was the only part available and my handwritten corrections were made based on the machine wave forms which were available at that time. The changes were made due to the inaccuracy of the computer marking. At the demand of Ms. Davis, I provided a clinical impression of the nerve conduction component only, which is not recommended as a complete interpretation. [. . . . ]

The EMG machine which we are using has not at this time been able to print wave forms of the EMGs. They apparently are automatically deleted over time due to memory capacity being utilized.

All medical records in my possession have been supplied to Ms. Davis. [. . . .]

She has been provided with all billing data to Medicare that we have. Due to a change in billing systems, we are unable to provid[e] billing data prior to 2007.

Ms. Davis has alleged fraud to the court and to Medicare in regards to our charges in 2007. Our medical records and billing statements from 2007 have been supplied to Medicare for

review. They have determined that the charges challenged[1] are a result of billing errors and as per regulation, the payments have been returned to Medicare.

* * *

My office submits over 25,000 charges yearly to Medicare. These errors are corrected by refunds, as in this case.

* * *

I deny the allegations of fraud made by Ms. Davis.

On July 31, 2009, the parties appeared for a second time for a hearing on the summary judgment motion. Davis moved to dismiss the motion or, alternatively, for a further continuance. Citing illness and chronic health issues, Davis stated that she was largely unable to "search for an attorney and/or expert witness" since the last hearing, but had recently located an attorney who had agreed to represent her and had consulted two experts. She sought more time to raise the funds to pay their retainers and prepare her case.

The court rescheduled the "final hearing" on Dr. Scariano's motion for summary judgment for December 18, 2009. Both at the July 31, 2009, hearing and in the order that followed, the trial court emphasized that "on that date the Motion for Summary Judgment will definitely be decided"and noted that it had "so advised" Davis.

When the hearing reconvened in December, defense counsel observed that five months had elapsed "and nothing is filed," except more of Davis's own, "unsupported, baseless allegations." At this point, Davis asserted that either Dr. Scariano had altered her records and then concealed the wave forms from her nerve tests or he had been "totally negligent" in maintaining her medical records. In either case, she reasoned, "his treatment is just as erroneous as his billing" and no expert proof was needed because Dr. Scariano's improper actions are obvious, even to a layman.

At the conclusion of the hearing, the trial court granted summary judgment based on its finding that Davis had failed to meet her burden of presenting competent evidence to counter the factual statements contained in the affidavit submitted by Dr. Scariano. In short, the court determined that there existed no genuine issue of material fact for trial.

---

[1]An attached notice to Ms. Davis from Medicare indicates that there were billing errors for two dates in October 2007.

Davis filed a timely notice of appeal.

## II.

Davis presents issues for this Court's review as follows:

> 1.  Did the trial court err in granting summary judgment in favor of Dr. Scariano?
>
> A.   Did the trial court err when it failed to consider spoilation of evidence and fraud?
>
> B.   Did the trial court err in denying Davis's attempts at discovery?
>
> C.  Did the trial court err in its apparent bias against Davis's pro se status?
>
> D.  Did the trial court err in applying "new law" to determine that expert testimony was necessary to support her malpractice claim and in failing to apply the "common knowledge exception" available at the time Davis's case was filed?
>
> 2.  Did the trial court err when it denied Davis's attempts to amend her complaint?

## III.

### A.

This court has reiterated the well-settled principles applicable to our review of a medical malpractice case dismissed on summary judgment:

> Summary judgment is properly entered in favor of a party when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Because summary judgment involves only questions of law and not factual disputes, no presumption of correctness attaches to the lower court's decision. Therefore, on appeal, we review the grant of summary judgment de novo to determine whether the

precepts of Rule 56 have been satisfied. ***Fitts v. Arms***, 133 S.W.3d 187, 189 (Tenn. Ct. App. 2003).

A defendant in a medical malpractice action may satisfy the precepts of Tenn. R. Civ. P 56 with an expert affidavit that "clearly and completely refute[s]" the allegations of medical negligence. ***Id***. at 190. The affidavit must rebut the allegations as to at least one of the three statutory elements for malpractice actions. ***Id***. The elements are set forth in Tenn. Code Ann. § 29-26-115, which states in relevant part:

(a)  In a malpractice action, the claimant shall have the burden of proving by evidence as provided in subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or speciality which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or speciality in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

To properly refute one of the statutory elements, a defendant must simply file an expert affidavit stating that all of his care and treatment of the plaintiff met the recognized standard of

acceptable professional practice or that his treatment was not the cause of any injury to the plaintiff that plaintiff would not otherwise have suffered. *Fitts*, 133 S.W.3d at 191. The defendant's submission of such an affidavit shifts the burden to the plaintiff to substantiate his claims with a counter affidavit containing evidence that would be admissible at trial. *Id*. at 190; *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 9 (Tenn. 2008).

*Harris v. Jain*, No. E2008-01506-COA-R3-CV, 2009 WL 2734083 at *4-5 (Tenn. Ct. App. E.S., filed Aug. 31, 2009).

## B.

A trial court's decision on a motion to amend a pleading is reviewed under an abuse of discretion standard. *Conley v. Life Care Ctrs. of Am., Inc*., 236 S.W.3d 713, 723 (Tenn. Ct. App. 2007); *Wilson v. Ricciardi*, 778 S.W.2d 450, 453 (Tenn. Ct. App. 1989). Abuse of discretion occurs "when the trial court reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard." *Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). The trial court's decision will be upheld "so long as reasonable minds can disagree as to the propriety of the [trial court's] decision." *Id*. (quoting *State v. Scott*, 33 S.W.3d 746, 751 (Tenn. 2000)).

## IV.

In her brief, Davis does not expressly present the trial court's grant of summary judgment as an "issue" for our review. A review of her brief, however, certainly indicates that this is the central focus of her appeal and we therefore address it as such, just as Dr. Scariano has done in his brief.

As we understand it, the essence of Davis's complaint is that Dr. Scariano intentionally altered her EMG tests results and purposely misdiagnosed the neurological condition of her arm. At the initial hearing, Davis stated that she had no idea why Dr. Scariano would have taken such actions. Subsequently, she offered various theories: "[I]t is [Davis's] belief that the alterations . . . to her records were fraudulent and not based on the readings of the EMG machine but were done maliciously because [Davis] [had] upset [Dr. Scariano's] routine by requesting a diagnosis on her records on October 15 . . . ." At the final hearing, Davis submitted,

it's not right that somebody because they have some sort of prejudice against someone that's on TennCare, and they don't think that that person deserves the best care they can give. So suddenly they just get to alter the evidence.

In any event, the trial court's bench ruling indicates that it considered whether Davis was entitled to proceed to trial on a claim for medical malpractice or fraud and concluded, based on her lack of evidence, that she was not. We agree. The court set forth its ruling as follows:

> [The] complaint, for whatever it's worth, is characterized by a heading saying "complaint of medical malpractice and fraud." The complaint does not allege with any clarity . . . what [acts and] omissions on the part of Dr. Scariano would constitute medical malpractice. And it is totally devoid of particulars alleging any basis for concluding that Dr. Scariano was guilty of fraud. . . .
>
> *   *   *
>
> And ultimately the matter came on for a hearing upon Dr. Scariano's motion for summary judgment . . . . [T]he Court concluded that [Davis] would be given additional time within which to properly respond to Dr. Scariano's motion for summary judgment by filing expert witness affidavits or such other competent evidence that might be appropriate to respond to that motion . . . . At that time this Court began urging [Davis] to acquire counsel who would understand the necessary procedural requirements to respond to the motion for summary judgment and otherwise prepare the case according to the well established procedures that litigants in this Court are expected to follow. And after concluding that [Davis] would be given additional time within which to properly respond to the motion . . . the Court stated in the clearest of terms that the matter would be reset for hearing on . . . December the 18th, 2009. . . . That order was entered on August the 6th, 2009. [Davis] finally responded by filing such additional materials as she thought sufficient to respond to Dr. Scariano's motion . . . . That filing having occurred on yesterday, December the 17th, 2009. . . . The filing . . . contains nothing except [Davis's] argument and

-12-

statements about what she agreed with and does not agree with, and is bereft of [any] competent evidence to confront or deal with the statements in Dr. Scariano's affidavit.

[Davis] . . . in a very protracted argument has urged this Court to disregard Dr. Scariano's affidavit, although this Court has been presented with no legal basis upon which it could [do so]. Such affidavits are common in medical malpractice cases. [Davis] would suggest a number of illogical and improper arguments, for example, to the effect that since Dr. Scariano apparently concedes that he may have made some error in his billing records, that he consequently is guilty of a pattern of misconduct and establishes that he is somehow liable for malpractice. [. . . ]

*   *   *

And so the Court dealing with the record that it has, based upon what is in it, and certainly based upon what is not in it . . . has no other option or alternative save to sustain the motion for summary judgment . . . .

We consider the substance of her claims. "Cases involving health or medical entities do not automatically fall within the medical malpractice statute." ***Draper v. Westerfield***, 181 S.W.3d 283, 290 (Tenn. 2005). A claim sounds in medical malpractice when "the decision, act, or omission complained of required the assessment of a patient's medical condition . . . [and] [was]based upon medical science, specialized training or skill." ***Conley***, 236 S.W.3d at 729.; ***Peete v. Shelby County Health Care Corp***., 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996).

In initially explaining her claim, Davis seemingly contended that Dr. Scariano committed malpractice by misdiagnosing her condition. Subsequently, however, Davis essentially conceded that her case sounded in fraud rather than malpractice when she argued that "the malpractice has arisen as a result of the fraud." In Tennessee, the elements of fraud are "(1) an intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity, … (3) an injury caused by reasonable reliance on the representation [and (4) the requirement] that the misrepresentation involve a past or existing fact…." ***Dobbs v. Guenther***, 846 S.W.2d 270, 274 (Tenn.Ct.App. 1992). Davis's claims – that Dr. Scariano intentionally changed her test results, allowing him to falsely indicate her neurological condition as "normal," and purposefully billed Medicare for services she did not receive –

-13-

amount to allegations of fraudulent misrepresentation both in his treatment and billing practice.

In the present case, we are confronted, as was the trial court, with a situation in which Davis has failed to meet her burden of presenting competent evidence – in fact, nothing at all – to establish that there is a genuine issue of material fact for trial. Again, with respect to summary judgment, "if the moving party makes a properly supported motion, then the non-moving party is required to produce *evidence of specific facts* establishing that genuine issues of material fact exist." (Emphasis added). To the extent, if any, that Davis's complaint encompasses a claim for medical malpractice, it was properly dismissed based on her failure to meet her burden of presenting expert proof to counter that provided by Dr. Scariano. And the same evidence – the affidavit(s) of Dr. Scariano – provides the basis for summary dismissal of her claim for fraud. Simply put, regardless of how her claim is characterized, summary judgment in favor of Dr. Scariano is appropriate.

V.

Next, Davis contends that the trial court erred in denying her motion to amend her complaint to add new defendants. During the July 31 hearing, Davis orally requested leave of court to amend "based on Dr. Scariano's statements that his equipment was faulty." Davis explained her view that statements by Dr. Scariano in his answer and subsequent affidavits to the effect that his computer marking system "was not operating properly" during her September nerve test and that the requested "wave forms" could no longer be printed amounted to a claim that his EMG machine was somehow defective or faulty. She reasoned that faulty equipment could be a cause of Dr. Scariano's "misdiagnosis" of her condition and "if that's the case then the manufacturer would be liable also. . . ." Davis thus sought to amend her complaint to add the Canadian manufacturer of the EMG machine and its parent company as co-defendants. During the hearing, Davis stated:

> And the only way to find out if the equipment is the cause of Dr. Scariano's fraud and negligence is by a finding of fact, and that cannot be done under summary judgment, and it's Dr. Scariano's own word that says that the equipment is faulty, and I would like to get permission of the Court to file the amended complaint.
>
> The Court: Anything further? I don't want that. I can't consider that. That's the whole problem. You have got to --

-14-

. . . . If that's even a viable issue in this case, it's got to be developed properly.

\* \* \*

. . . . Well, let's see what you've got. If you're going to hire a lawyer, I'm a little bit reluctant to do anything.

. . . . Well, all you have got is an amended complaint.

Davis: Yes, Well, you know --

The Court: No motion has been filed to amend the complaint.

Toward the end of the hearing, after granting Davis a further continuance until December 18, 2009, discussion of her motion to amend resumed:

Davis: Your Honor, concerning my request to amend the complaint, do I have leave of the Court --

The Court: I don't see in the file that you filed a written motion to do that.

Davis: I can include a written motion later today.

The Court: Well, if a written motion is filed, we'll set it on this Court's calendar just like we did this motion and every other motion . . . .

Davis: Would we be able to set it at an earlier date than December 18th on that particular motion?

The Court: Well, if you are going to file a motion to amend the complaint, I suggest you better do it before then. I don't want you coming in here on the 18th of December and saying, well, I want to amend my complaint, put this off again.

\* \* \*

-15-

The Court: But there's no motion . . . . I'm not granting any motions that haven't been filed or even hearing it.

Davis: Okay. I'll file it before I leave the courthouse.

The Court: That's your prerogative, but if you are going to get a lawyer in this, you better get a lawyer to do some of these things to make sure you don't make the problem worse.

At 4:16 pm, on the afternoon of December 17, 2009, the day before the scheduled "final" hearing, Davis filed a written motion to amend her complaint. She alleged that based on statements by Dr. Scariano, the EMG he used may have malfunctioned during her tests in July and September 2007, "causing Dr. Scariano to make alterations" to the results and misdiagnose her condition. Davis concluded that the manufacturers, together with Dr. Scariano, had neglected their obligation to assure that the equipment operated correctly, and, in view of their "reckless disregard for patient safety," moved that the manufacturers be made co-defendants. In the course of its bench ruling, the trial court denied Davis's motion to amend as follows:

[Davis] in order to apparently avoid a summary judgment has also as of yesterday filed a motion to amend her complaint to, among other things, name some manufacturer of equipment utilized by Dr. Scariano in the course of his medical practice. Such motion to amend the complaint in the judgment of this Court comes far too late and it is not warranted by justice under the circumstances.

Pursuant to Tenn. R. Civ. P. 15.01, leave of court to amend pleadings "shall be freely given when justice so requires." This Court has observed, however, that this provision does not mandate that leave be given, "only that it 'shall be freely given' " when appropriate. *Gentry v. Wagner*, No. M2008-02369-COA-R3-CV, 2009 WL 1910959 at * 3 (Tenn. Ct. App. M.S., filed Jun. 30, 2009) (citing *Waters v. Coker*, No. M2007-01867-COA-RM-CV, 2008 WL 4072104, at *4 (Tenn. Ct. App. M.S., filed Aug. 28, 2008)). "Once a responsive pleading has been filed, a party is entitled to amend a pleading only with the adverse party's consent or with leave of court, which is within the trial court's discretion to grant or deny." *Id.*; Tenn. R. Civ. P. 15.01. Factors relevant to the trial court's decision include: "1) undue delay in filing, 2) lack of notice to the opposing party, 3) bad faith by the moving party, 4) repeated failure to cure deficiencies by previous amendments, 5) undue prejudice to the opposing party, and 6) futility of amendment." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 42 (Tenn. Ct. App. 2006).

In the present case, the trial court expressly cited the lateness of Davis's filing. A review of the ruling in its entirety indicates that the court also considered the lack of notice to Dr. Scariano (and the court) that Davis intended to pursue the amendment, and prejudice to Dr. Scariano in having the summary judgment hearing delayed yet again. Its eleventh-hour filing aside, we think the generally-pled, unsupported allegations against the manufacturer fail to present a facially valid claim of any kind and evidence the "futility of amendment." *Id*. We therefore agree with the trial court's conclusion that amendment of the complaint was not in the interest of justice in this case. In summary, nothing in the record indicates that the trial court's decision was "against logic or reasoning that caused an injustice to the complaining party." *Eldridge v. Eldridge,* 42 S.W.3d at 85. The trial court did not err in denying the motion to amend the complaint.

## VI.

Lastly, Davis challenges various findings and rulings the trial court made en route to dismissing her case. Among other issues, she contends that the trial court erred in failing to consider Dr. Scariano's "spoilation of evidence and fraud;" in failing to permit discovery of evidence "beyond what [Dr. Scariano] was willing to offer up," and in applying "new law" to require expert proof in support of her malpractice claim. Dr. Scariano correctly contends that Davis has made it difficult, if not impossible, to respond to these issues by failing to present appropriate citations to the record and/or citations to relevant authorities as required. *See* Tenn. R. App. P. 27(a); Tenn. Ct. App. R. 6. In her reply brief, Davis essentially responds that she complied with the rules "to the best of her ability within the limitations afforded her by her pro se status and health. . . . "

With respect to pro se litigants, this Court recently observed:

> A pro se litigant, who has decided to represent himself, is entitled to fair and equal treatment by the courts. We measure the papers prepared by pro se litigants by less stringent standards than those applied to papers prepared by attorneys. Thus, courts should give effect to the substance, rather than the form or terminology of a pro se litigant's papers. As we grant such consideration to a pro se litigant who is untrained in the law, it is also important that we be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary.

*Watson v. Fogolin*, No. M2009-00327-COA-R3-CV, 2010 WL 1293797 at * 3 (Tenn. Ct. App. M.S., filed Apr. 1, 2010)(internal citations omitted).

Despite the apparent waiver of her remaining issues due to the inadequacies of her brief, we elect to briefly address Davis's assertion that the trial court was biased against her throughout this case because of her pro se status. Following a most thorough review of the record, we could not disagree more. First, despite the lack of evidence submitted by Davis, the trial court granted Davis's repeated requests to continue the summary judgment hearing. At each hearing, the trial court took great pains to caution Davis that it was certainly her right, but not necessarily a good idea, for her to attempt to gather on her own the necessary evidence to avoid summary judgment. Similarly, when Davis sought leave to amend her complaint during the second time the parties appeared for a hearing on the defendants' motion, the court advised her she would need to file a written motion seeking leave of court to amend and again counseled her to get an attorney. In July 2009, the court, in no uncertain terms, stated that the summary judgment motion would be finally heard on December 18 and expressly cautioned Davis against waiting until that time to pursue an amendment – advise she ignored.

In our view, the trial court gave Davis every opportunity to make a case, as evidenced by the following exchange at the July hearing:

> Davis: [I]f the Court will grant me a continuance so that I have time to raise the funds that I need to level the playing ground between myself and Dr. Scariano, if I don't have an attorney to show up in court, I will prepare a withdraw (sic) of the case and provide it to Mr. Daves prior to that date and file it with the Court.
>
> * * *
>
> The Court: You will have all of August, September and October, so sometime in November or I'm even willing to go to December.
>
> * * *
>
> The Court: All right. That's bending over backwards to the point that it almost damages my spine, Ms. Davis. I'm going to reset this hearing for December the 18th. [. . . .] . . . Dr. Scariano, from his affidavit, is negating your case, has shown that he is entitled to summary judgment, unless you can come up with something to show that there is indeed a genuine issue of fact for the jury to try in this case.

Davis: Yes, sir, I do understand that.

The Court: And if you don't show that there is a genuine issue of fact by some competent evidence, then I'm going to sustain his motion, dismiss the case. If you show it, we'll overrule his motion and we'll go on and set the case for trial and get it disposed of, but I think that we have been more than generous with you, and I understand your predicament: Lack of finances, your inability to appreciate a lot of the nice distinctions that are necessary to properly develop and present the proof in this case.

Nothing in the record reflects that the trial court was biased against this pro se litigant. On the contrary, the trial court bent over backwards to accommodate her because she was proceeding without an attorney. For all the foregoing reasons, we conclude that summary judgment was properly granted.

## VII.

The judgment of the trial court is affirmed. This case is remanded to the trial court, pursuant to applicable law, for the collection of costs assessed below. Costs on appeal are taxed to the appellant, Deborah Lynn Davis.

_____
CHARLES D. SUSANO, JR., JUDGE

-19-